IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| THE ESTATE OF DAVID PAPADAKOS, deceased, and the heirs of David Papadakos, MICHAEL and CATHERINE PAPADAKOS,<br><br>Plaintiffs,<br><br>v.<br><br>L. VANCE NORTON, in his official and individual capacities; LISA JORGENSEN, in her official and individual capacities<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br>Case No. 2:14-CV-00774<br><br>Judge Robert J. Shelby |

Plaintiffs bring two civil rights claims under 42 U.S.C. § 1983, alleging violations of the deceased David Papadakos' rights and malicious prosecution. (Dkt. 2.) Defendant Lisa Jorgensen moves for judgment on the pleadings. (Dkt. 13.)

For the reasons stated below, the court grants Ms. Jorgensen's motion.

## BACKGROUND[1]

In November 2010, David Papadakos adopted a twelve-year-old child, B.P., who had been in and out of foster care for about seven years. (Dkt. 2, ¶¶ 13, 14.) B.P. lived with Mr. Papadakos for a six month "trial period" prior to his formal adoption.

On October 11, 2012, B.P. ran away from home—not for the first time—and went to a classmate's home. Once there, he allegedly informed his classmate and friend that he had been

---

[1] On a motion under Federal Rule of Civil Procedure 12(c), the court takes all facts alleged in the complaint to be true. The following facts alleged in the Complaint (Dkt. 2) are relevant to this motion.

1

sexually abused by Mr. Papadakos.  Defendant L. Vance Norton, a detective in the Vernal Police Department, and Jordan Witbeck, an employee of the Utah Division of Child and Family Services (DCFS), received this information.  They traveled to the classmate's home to interview B.P.  Once they arrived, B.P. stated that he did not wish to speak to them.  B.P. was returned that night to Mr. Papadakos' home.

The following day, DCFS employee Lisa Jorgensen traveled to B.P.'s school to interview him.  Mr. Norton then arranged for a police officer to take B.P. into custody and transport him to the Children's Justice Center in Vernal, Utah for further questioning.  B.P. asked over a period of hours whether he could leave, but was not allowed to do so.  Ms. Jorgensen and Mr. Norton both interviewed B.P. during these hours.  B.P. was eventually allowed to leave, though he was not allowed to return to Mr. Papadakos.[2]  Ms. Jorgensen and Mr. Norton continued this questioning the following day, and on other days, and in so doing allegedly coerced, intimidated, and or supplied B.P. with facts to "compose the story" of Mr. Papadakos' abuse.  B.P. further claimed that Mr. Papadakos had abused another child he had considered adopting.  Separately, Mr. Norton interrogated Mr. Papadakos, who was not in attendance during B.P.'s questioning.

On October 25, 2012, Mr. Papadakos was arrested and charged with two counts of aggravated sexual abuse of a child, and ten counts of forcible sexual abuse.  (Dkt. 2, ¶¶ 9, 10.) Plaintiffs allege that B.P.'s coerced testimony formed the basis for these felony charges.  Mr. Papadakos denied the allegations, but because of the charges he lost his employment as Vice Principal at Vernal Middle School, was expelled from Southern Utah University's graduate program, and was barred from participation in the Boy Scouts of America, where he had been

---

[2] The Complaint supplies no further information as to whose custody B.P. was released, and B.P.'s whereabouts and the circumstances of his questioning from October 12 onward are not pled consistently or coherently.  *See infra* pp. 11-12.

involved for 33 years. On January 17, 2013, he committed suicide. (Dkt. 2, ¶¶ 48-49; Dkt. 27, p. 3.)

Mr. Papadakos' estate and his parents bring claims based on the alleged wrongful acts of Mr. Norton and Ms. Jorgensen.[3] The Estate's first cause of action asserts a civil rights claim arising under the Fourth, Fifth, and Fourteenth Amendments of the Constitution. The second claim is for malicious prosecution. Because Mr. Norton and Ms. Jorgensen acted under color of state law, these claims are brought under 42 U.S.C. § 1983. Before the court is Ms. Jorgensen's motion for judgment on the pleadings. (Dkt. 13.)

## ANALYSIS

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is reviewed under the same standard applied to a Rule 12(b)(6) motion to dismiss. A 12(c) motion should be granted when no material issue of fact remains and the party is entitled to judgment as a matter of law. *Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1228 (2012). Though Ms. Jorgensen asserts that the Estate's claims are, on their face, implausible, (Dkt. 13, pp. 3-4), the court's analysis focuses solely on whether they are legally sufficient.

**I. Claim One: Civil Rights**

On the first cause of action, for deprivation of constitutional rights, Ms. Jorgensen raises a defense of qualified immunity. Immunity of this nature "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotations omitted). Where a state actor raises the defense of

---

[3] The parties do not distinguish in their papers between the estate and any claims asserted by Mr. Papadakos' parents. For this reason, the court confines its analysis, and refers to Plaintiffs jointly as the Estate.

qualified immunity, "the onus is on the plaintiff to demonstrate '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Quinn v. Young*, 780 F.3d 998, 1004 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2080 (2011)). This unusual burden-shifting is necessary because "[t]he question of qualified immunity… dovetails almost precisely with the substantive inquiry in a section 1983 action; both depend on the specific contours of the constitutional right at issue." *Wilson v. Meeks*, 52 F.3d 1547, 1552 (10th Cir.1995); *see Adkins v. Rodriguez*, 59 F.3d 1034, 1036 (10th Cir. 1995). This places a "heavy burden" on the plaintiff. *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1314 (10th Cir. 1999).

### A. "Clearly Established" Rights

Courts may address the second prong of a plaintiff's required showing without first examining the alleged violation itself. *Pearson*, 555 U.S. at 236; *see, e.g., Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010) (finding that judicial economy often is promoted by this approach). District courts are in fact instructed to do so where qualified immunity is asserted at the pleading stage. *Kerns v. Bader*, 663 F.3d 1173, 1180-81 (10th Cir. 2011). Ms. Jorgensen directs her arguments accordingly, asserting that any right purportedly violated was not "clearly established." (Dkt. 13, pp. 5-8.)

For a right to be clearly established, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007) (en banc) (quoting *Medina v. City of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)). Precisely identifying the right in question is necessary for any productive inquiry into whether the right was clearly established. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009)

(noting that "it often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be."). The inquiry into identifying the established right "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Cortez v. McCauley*, 478 F.3d 1108, 1114 (10th Cir. 2007) (*quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001)). In meeting the burden, a plaintiff "cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it." *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000). Instead, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (*quoting* Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Thus, "[a]lthough it is not necessary for the facts in the cited authority to correspond exactly to the situation the plaintiff complains of, the 'plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited.'" *Estate of B.I.C. v. Gillen*, 761 F.3d 1099, 1106 (10th Cir. 2014) (*quoting Trotter v. Regents*, 219 F.3d 1179, 1184 (10th Cir. 2000)).

In its Complaint, the Estate generally alleges violations of the Fourth, Fifth, and Fourteenth Amendments to the Constitution. (Dkt. 2, p. 7.) In response to the present motion, the Estate identifies the claimed rights with greater, though imperfect, specificity. (Dkt. 27, pp. 10-19.)[4] Though it is less than clear, the Estate appears to identify four rights it maintains are "clearly established": (1) the constitutional rights of a child to be free from coercive questioning and interrogation; (2) a parent's right not to have a child's coerced statements used against him in

---

[4] The Complaint also alleges a violation of Mr. Papadakos' liberty from unreasonable and unlawful seizure of his person. (Dkt. 2, p. 7), but does not discuss it in its opposition. Assuming that the right is clearly established, the Estate has not met its burden to allege that this right was actually violated by Ms. Jorgensen.

5

a criminal proceeding[5]; (3) a parent's fundamental right of the care, custody, and management of his child; and (4) a parent's fundamental right to familial association and family unity. (Dkt. 27, p. 18.)

The court concludes that the Estate has failed to meet its heavy burden to demonstrate that these four rights are clearly established in the factual context supplied by this case. Ms. Jorgensen is therefore entitled to qualified immunity.

**1. Due Process and Use of Coerced Statements**

The Estate argues that Mr. Papadakos had a clearly established "constitutional right not to have another's coerced statements used against him" in the context of a criminal proceeding, based on unspecified provisions of the Fourth, Fifth, and Fourteenth Amendments. (Dkt. 27, p. 10.)

There are significant deficiencies in the Estate's argument. First, despite the invocation of the Fourth and Fifth Amendments, the only case cited by the Estate for the existence of a clearly established right relating to coerced statements is *Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997). And even then, only in relation to the Fourteenth Amendment. Given the plain lack of cited authority in support of a right originating in the Fourth or Fifth Amendments, the Estate has not met its burden to establish any "clearly established" right flowing from them.

The Estate cites *Clanton* for the proposition that it is "'inescapably clear' that the Fourteenth Amendment forbids government use of coerced statements against an accused." (Dkt. 27, p. 10.) This is a markedly overbroad description of *Clanton*'s holding. *Clanton* dealt not with coerced *statements*, but a coerced *confession*. *Clanton*, 129 F.3d at 1157-58.

---

[5] Or, alternately described, "…to establish the basis of a criminal prosecution" (Dkt. 27, p. 10), or "…to initiate criminal charges." (Dkt. 27, p. 19.)

6

Specifically, the facts of the case involved the standing of a criminal defendant to overcome qualified immunity in contesting the voluntariness of their co-defendant's confession. *Id.* at 1158.  The *Clanton* court, in discussing whether the right was "clearly established," looked directly to the Fifth Amendment's right against self-incrimination.  *Id.*

The relevance of this narrow holding to the present case is unclear.  B.P. did not "confess" to anything; taking the allegations in the Complaint to be true, he offered statements incriminating of *another* person, but not of himself.  No criminal prosecution was undertaken against B.P., and a child describing their own sexual abuse has not admitted to wrongful conduct.

Though coerced statements may be rendered inadmissible either by evidentiary or exclusionary rules, *Clanton*, like the present suit, involved a Section 1983 suit for the direct vindication of constitutional rights.  If there is authority for the idea that the accused has a right against the use of a coerced statement of any kind, sufficient to give rise to a claim under Section 1983, *Clanton* does not provide it, and the Estate cites to no other authority establishing such a right.  The only briefing addressing this question is provided by Ms. Jorgensen, rather than the Estate, and it suggests nothing of the kind. (Dkt. 33, pp. 4-6.). Ms. Jorgensen's cases instead suggest the relevant context for the right is the introduction of evidence at trial. *E.g.*, *Fields v. Wharrie*, 672 F.3d 505, 518 (7th Cir. 2012); *U.S. v. Dowell*, 430 F. 3d 1100,1107 (10th Cir. 2005); *U.S. v. Hodges*, 208 F. 3d 227 (10th Cir. 2000).

The Estate's inconsistent and imprecise description of the alleged right further weakens any case for its "clearly established" character.  The Estate refers to at least three conceptually distinct ways in which the coerced statement might be used: "to establish the basis of a criminal prosecution" (making an arrest or an indictment possible) (Dkt. 11, pp. 10-11, 14); "to initiate criminal charges" (realizing that potential) (Dkt. 11, pp. 11, 19); and for use "against him in a

7

criminal proceeding" (which might involve evidence coerced before *or* after an arrest or indictment) (Dkt. 11, p. 18).  The scope and availability of constitutional rights in the context of criminal procedure vary widely depending on the specific time at which a purported violation may have occurred.  (Compare, for instance, the rights to counsel under the Fifth and Sixth Amendments).  The facts of this case, where Mr. Papadakos died prior to the preliminary hearing, make attention to situating the right at issue within the timeline of a criminal proceeding especially important.  The Estate fails to map or navigate these distinctions in any way.  This vagueness in identifying the specific character of the right in question is fatal to the Estate's attempt to overcome qualified immunity.

In light of these considerations, the Estate has not carried its "heavy burden" to identify a "clearly established" constitutional right relating to the coerced statements.  *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1314 (10th Cir. 1999).[6]

**2. Rights of the Family**

The Estate identifies two additional "clearly established" rights that it alleges were violated.  The Estate argues that "[t]he interest of parents in the care, custody, and management of their child is a fundamental liberty interest protected by the Fourteenth Amendment."  (Dkt. 27, p. 16.)  Similarly, the Estate argues that "the familial right of association is also a fundamental right protected by the Fourteenth Amendment."  *Id*.  The court will follow the Estate's approach in evaluating these two rights in tandem.  (Dkt. 27, pp. 16-19.)

Merely alleging an infringement of these liberty interests would not necessarily give rise to a constitutional violation, which the Estate itself concedes.  (Dkt. 27, pp. 16-17.)  Instead, the

---

[6] For the purposes of deciding this motion, the court assumes the statements were coerced.

relevant right for our analysis is Mr. Papadakos' right to due process—if any—*prior* to the deprivation of those interests.

The Estate cites to various cases that do in fact suggest a "clearly established" right that would be implicated on different facts than those here presented. The Estate has not, however, pointed to any "clearly established" due process right for the deprivations it has pled.

*Santosky v. Kramer*, 455 U.S. 745 (1982), held that parents retained a due process right in a State's parental rights termination proceeding. *See id.* at 753-54. *Snell v. Tunnell*, 920 F.2d 673 (10th Cir. 1990), found qualified immunity overcome where social workers used knowingly false information to secure a court order allowing entry into a parent's home and the removal of seven children from foster care into the custody of a juvenile center. *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306 (10th Cir. 1999), similarly held that a caseworker within a county's social services department lacked qualified immunity for her conduct where, in the course of investigating possible sex abuse, she secured a custody order through "reckless omissions" of relevant information to a magistrate. *Id.* at 1315-16. *Malik* squarely held that "except in extraordinary circumstances, a parent has a liberty interest in familial association and privacy that cannot be violated without adequate pre-deprivation procedures," and that an ex parte hearing based on "misrepresentation and omission" could not meet that standard. *Id.* at 1315.

The Estate's most recent authority, *Gomes v. Wood*, 451 F.3d 1122 (10th Cir. 2006), holds, in keeping with these and other precedents, that "state officials may not remove children from the home, through either temporary seizures or the permanent termination of parental rights, without providing due process of law." *Id.* at 1127.

Though *Gomes* allowed qualified immunity to the caseworker at issue, its organizing principle is useful to summarize the relevant authority: "when a state agency seeks to remove

9

children from the home, due process requires that the parents receive prior notice and a hearing, except in 'extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.'" *Id.* at 1128.

The *Gomes* line of cases clearly depends on the removal of a child from parental custody for the child's protection. The Estate, in this sense, makes a category error. There is no allegation that Ms. Jorgensen or anyone from the State brought B.P. into "protective" custody, secured (or even sought to secure) a custody order from a court, actually "removed" B.P. from Mr. Papadakos' home, or otherwise sought to terminate, even on a temporary basis, the parental custody rights of Mr. Papadakos over B.P. Instead, the facts alleged suggest that B.P. was in the control of state officials in the course of their investigation into criminal conduct.[7]

On the facts here alleged, the court must entertain the possibility that an extended interrogation, or several such interrogations, though not a legal removal from the home, could amount in practice to a termination of parental custody rights. Though the Estate provides no authority for this position, and does not focus on the distinction, to conclude otherwise could have a dangerous implication. Namely, if a state could isolate a child from a parent without informing the parent of the child's whereabouts, for a prolonged period, without implicating the parent's due process rights, this would effectively enable officials to secure the equivalent of temporary custody through an "investigation," whether administrative or criminal. This custody, moreover, might be insulated from the review of a magistrate or other judicial official. A state official who bears responsibility not to violate a "clearly established" right necessarily bears

---

[7] To the extent that the court might seek to identify the content of any intermediate "clearly established" right, between the non-existent right to be present at custodial interrogation of the child and the clearly-established right to some due process prior to a severing of parental custody rights, authority would appear to tilt more toward Ms. Jorgensen. *See* Dkt. 13, pp. 6-7; Dkt. 33, pp. 6-7. This would certainly not provide the "weight of authority" necessary for the court to identify the right absent a directly cited controlling precedent. *Cortez v. McCauley*, 478 F.3d 1108, 1114-15 (10th Cir. 2007) (en banc).

10

responsibility not to violate its factual and logical equivalent. To allow officials to secure by a patently unreasonable workaround what they could otherwise obtain only through legal process would allow academic distinctions to sanction identical conduct.

Though this conclusion is plausible, it would at least require the court to have before it those factual allegations. The Estate, however, has not made factual allegations that would implicate such a right.

In relevant part, the Complaint is far too vague. The Estate provides great detail on B.P.'s relationship with Mr. Papadakos, and how he came to be a member of his family. It likewise specifies his whereabouts and the circumstances of his questioning up to the afternoon of October 12, 2012. (Dkt. 2, pp. 2-6.) Past that point, the nature of what is alleged to have occurred is difficult to discern.

Again, taking the allegations in the Complaint as true, on October 12 B.P. was interviewed by Ms. Jorgensen at his school, and then transported in the custody of a police officer to the Children's Justice Center in Vernal, Utah, where he was questioned by Ms. Jorgensen and Mr. Norton "for several hours." (Dkt. 2, ¶¶ 33, 36-39.) Describing the end of this interrogation, the Estate states simply that "[w]hen Defendants eventually allowed [B.P.] to leave they did not allow him to return to his home as he requested." *Id.* at ¶ 40. The Complaint alleges no further detail about where B.P. was taken, to whose custody he was remanded, and how the prohibition on returning to Mr. Papadakos was enforced. The Complaint then alleges, obscurely, that "Defendants *continued to keep control of* and question [B.P.] *on several other occasions*, including the following day," and that "these interrogations" involved hours of questioning in each session. *Id.* at ¶ 41 (emphasis added). The Estate is silent concerning B.P.'s whereabouts during the night, or during that portion of the following day where he was not in custody, and it

is unclear whether he was prohibited from returning to or contacting his parent following the interrogation. Neither does the Estate indicate whether Mr. Papadakos was even aware of the additional interviews, or B.P.'s whereabouts.

This is not a failure of notice pleading. The facts alleged do not show an extended or continuous removal of the child from the parent's custody, beyond a period of a few hours; do not indicate that any prohibition of contact between the child and the parent was enforced; and do not even speak to whether Mr. Papadakos was unable to exercise his parental custody rights over his child.[8] Because the Estate has failed to allege facts implicating the "clearly established" right it identifies, it cannot overcome qualified immunity.

### 3. Right to Freedom from Coercive Interrogation

Finally, the Estate argues that the right of a child to be free from coercive questioning and interrogation is "clearly established." (Dkt. 27, p. 18-19.) The Estate, however, offers no argument in support of this point. Ms. Jorgensen correctly notes that the Estate lacks standing to assert a claim based on an alleged violation of B.P.'s rights. (Dkt. 33, p. 3); *see, e.g.*, *U.S. v. Gonzales*, 164 F.3d 1285, 1289 (10th Cir. 1999). "[D]efendants must point to violations of their own constitutional rights," and here, the focus can only be on whether "subsequent use of the statements could potentially implicate defendants' due process rights." *Gonzales* at 1289. Because the Estate lacks standing to bring a Section 1983 suit to vindicate B.P.'s rights, it obviously cannot meet the burden to overcome an assertion of qualified immunity.

---

[8] Perhaps recognizing this defect, in their opposition, the Estate says that "[o]ver several hours, and extending into multiple days, B.P. was interrogated by Defendants. He was not allowed to leave and was isolated." (Dkt. 27, p. 2.) This description again lacks clarity. It also arguably contradicts the Complaint, which stated that B.P. was allowed to leave (Dkt. 2, ¶ 40) and that he was interrogated in some frequent but nonetheless interrupted fashion over an unspecified number of days. (Dkt. 2, ¶ 41.)

No "clearly established" right being implicated by the alleged facts, Ms. Jorgensen has qualified immunity from the Estate's claim under Section 1983 for the violation of constitutional rights. The motion for judgment on the pleadings is granted on the first claim for relief.

## II. Claim Two: Malicious Prosecution

Ms. Jorgensen is also granted judgment on the pleadings on the Estate's second claim, for malicious prosecution.

"In this circuit, when addressing § 1983 malicious prosecution claims, we use the common law elements of malicious prosecution as the 'starting point' of our analysis; however, the ultimate question is whether plaintiff has proven the deprivation of a constitutional right." *Novitsky v. City Of Aurora*, 491 F.3d 1244, 1257 (10th Cir. 2007).[9] A malicious prosecution claim brought under § 1983 has the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) there was not probable cause to support the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Id.* at 1258 (10th Cir. 2007). In evaluating these elements, the 10th Circuit looks both to common law articulation by the relevant state courts and the guidance provided by the Restatement (Second) of Torts. *E.g.*, *Wilkins v. DeReyes*, 528 F.3d 790, 802 (10th Cir. 2008).

Ms. Jorgensen moves for judgment on the pleadings on the basis that the claim fails on the second element as a matter of law.[10] (Dkt. 13, pp. 9-10.) Specifically, Ms. Jorgensen argues

---

[9] *Compare Hygh v. Jacobs*, 961 F.2d 359, 367-68 (2d Cir. 1992) (looking to "applicable state law" for those elements).

[10] As Ms. Jorgensen notes, the Complaint would also be vulnerable to a 12(b)(6) challenge on elements (1) and (4).

that termination of proceedings on the basis of the death of the accused is not a termination "in favor" of the deceased.

The case against Mr. Papadakos was dismissed because of his death. (Dkt. 13-1.) As Ms. Jorgensen correctly notes, the Estate identifies no "case holding that underlying criminal proceedings terminated in favor of the accused where the accused died while the criminal case was pending." (Dkt. 33, p. 7.) The Restatement's approach also favors Ms. Jorgensen. Though the formal abandonment of proceedings by a prosecutor generally will be viewed as a termination in favor of the accused, Restatement (Second) of Torts § 659(c) (1977), it "is not a sufficient termination in favor of the accused if the abandonment is due to the impossibility or impracticability of bringing the accused to trial." *Id.* § 661. Though Section 661 and its comments do not discuss whether the death of the accused meets the exception of "impossibility," courts have applied the Section 661 exception where the accused's death was the reason for termination. *See Mitchell v. City of Albany*, No. 08-CV-871, 2010 WL 1235389, at *6 (N.D.N.Y. Mar. 31, 2010).

In this court's view, the application of the "impossibility" exception to the present case appears appropriate. The animating principle behind the circumstances of termination is whether they provide an indication of the accused's innocence. The termination here is "neither an acquittal of the charges nor any determination of the merits" and "leaves the question of guilt or innocence unanswered." *Hygh v. Jacobs*, 961 F.2d 359, 368 (2nd Cir. 1992) (internal quotations omitted). In discussing another exception to the general rules of termination in favor of an accused, the Restatement authors have also noted that where "the question of his guilt or innocence is left open," the accused cannot be said to have had the proceedings cease in his favor. Restatement (Second) of Torts § 660, cmt. on (a). (1977). The prosecution abandoned the

14

case because it could not continue to prosecute Mr. Papadakos, and his death does not speak one way or the other to his guilt or innocence.

The Estate invites the court to rely on the policies underlying malicious prosecution claims and Section 1983 litigation, but the argument is unconvincing.  The Estate asserts that Ms. Jorgensen's conduct was the proximate cause of Mr. Papadakos' suicide; that Mr. Papadakos' suicide was the cause of dismissal; and therefore that Ms. Jorgensen was the cause of the dismissal.  In this view, to allow Ms. Jorgensen's illegal conduct to preclude liability for that same course of conduct would run contrary to the purposes underlying the use of Section 1983 for malicious prosecution claims—including "the prevention of abuses of power by those acting under the color of state law," and deterrence of such abuses by the prospect of liability.

The Estate, however, cites no authority for the idea that this court can ignore an express element of a cause of action recognized both under state law and binding Circuit precedent.  The Estate does not dispute that termination of the proceedings in favor of the plaintiff is a material element of a plaintiff's malicious prosecution claim, but it is not the proper role of this court to ignore or rewrite the tort simply to advance public policy.  Ms. Jorgensen's argument rests solely on the uncontested notion that a material element of a claim, if it cannot be proven, causes the claim to fail as a matter of law.

Therefore, even accepting as true that Ms. Jorgensen maliciously caused a prosecution without probable cause, inflicting damages on the plaintiff, that prosecution did not terminate in favor of the deceased.  A material element of The Estate's claim failing as a matter of law, the claim itself must also fail, and judgment on the pleadings is granted on the Estate's second claim.

## CONCLUSION

Defendant's Motion for Judgment on the Pleadings is hereby **GRANTED**. (Dkt. 13.)

Ms. Jorgensen is terminated as a party in this case.

**SO ORDERED** this 21st day of July, 2015.

BY THE COURT:

_____
ROBERT J. SHELBY
United States District Judge